**SOUTHERN CALIFORNIA GAS COMPANY, Plaintiff–Appellant,**

v.

**UTILITY WORKERS UNION OF AMERICA, LOCAL 132, AFL–CIO, Defendant–Appellee.**

No. 98–56842.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 6, 2001

Filed Sept. 7, 2001

Timothy S. Lykowski, Esq., Los Angles, California, for the appellant.

Glenn Rothner, Esq., Pasadena, California, for the appellee.

Before: ALARCON, BRUNETTI, and HAWKINS, Circuit Judges.

Opinion by Judge BRUNETTI; Dissent by Judge ALARCON.

BRUNETTI, Circuit Judge:

In this case, two utility workers were terminated after their company learned from its medical review officer, whom the company believed was a licensed physician, that both workers had failed federally-required random drug tests. Shortly thereafter, the medical review officer was arrested for impersonating a licensed physician. Once the workers' union learned that the medical review officer was an imposter, it pressed for the workers' reinstatement. The company refused and arbitration ensued pursuant to a collective bargaining agreement between the company and the union. The arbitrator found in the workers' favor and ordered them reinstated. Dissatisfied with this result, the company asks us to vacate the arbitration award. We have jurisdiction under 28 U.S.C. § 1291. Under well-established principles affording us an extremely limited role in reviewing arbitration awards, we refuse to disturb the arbitrator's decision and thus affirm.

I.

Appellants Lorenza Wilson ("Wilson") and Gerry Daniel ("Daniel") are members of the Utility Workers Union of America, AFL–CIO, Local 132 ("the Union"). As members of the Union, they are subject to the terms of a collective bargaining agreement ("CBA") between their employer, Southern California Gas Company ("the Gas Company") and the Union. The CBA provides for the arbitrability of claims relating to discipline and, more specifically, discipline arising from drug abuse, on or off the job, in violation of the parties'

negotiated agreements and government mandates. The parties agreed that arbitration "shall be the exclusive means of settling such disputes."

In 1988, the Union and the Gas Company negotiated a comprehensive drug testing policy. The policy was modified in 1990 in response to newly-implemented federal regulations, issued by the Department of Transportation ("DOT"), which require operators of pipeline facilities (including the Gas Company) to test employees for the presence of prohibited drugs and provide employee assistance programs. The parties subsequently agreed that they would utilize the CBA's grievance procedure in the case of any disagreement over the Gas Company's implementation and enforcement of the new regulations. The Union also reserved the right to grieve and arbitrate any action by the Gas Company which it believed was in violation of the DOT's regulations.

The federal drug-testing regulations at issue require, *inter alia,* random testing for employees working in safety-sensitive positions. The regulations governing operators of pipelines, set forth in Title 49, Section 199 *et. seq.* in the Code of Federal Regulations, require that the anti-drug program prescribed therein be conducted according to the requirements of that title, as well as "DOT Procedures." These "DOT Procedures" are set forth in the Procedures for Transportation Workplace Drug Testing Programs published by the Office of the Secretary of Transportation, 49 C.F.R. § 40. The DOT Procedures exhaustively detail the protocol to be followed in administering drug tests to employees, including preparation for testing, specimen collection procedures, laboratory analysis procedures, quality assurance and quality control, and, most relevant here, reporting and reviewing results. 49 C.F.R. §§ 40.1–40.39. Employers are responsible for compliance by their officers, employees, agents, consortia and/or contractors. *Id.* § 40.1.

"An essential part of the drug testing program is the final review of confirmed positive results from the laboratory." 49 C.F.R. § 40.33. Significant here, a positive test result does not automatically identify an employee as having used drugs in violation of a DOT regulation. Before such a determination is made, an individual with detailed knowledge of possible alternative medical explanations must review the results. This review shall be performed by a Medical Review Officer ("MRO") prior to the transmission of the results to employer administrative officials. An MRO is defined as

[a] licensed physician (medical doctor or doctor of osteopathy) responsible for receiving laboratory results generated by an employer's drug testing program who has knowledge of substance abuse disorders and has appropriate medical training to interpret and evaluate an individual's confirmed positive test result together with his or her medical history and any other relevant biomedical information.

40 C.F.R. § 40.3. The MRO is responsible for reviewing, interpreting, and confirming positive results before communicating the result to an employer. Prior to making a final decision to verify a positive test result for an individual, the individual must be given an opportunity to discuss the test result with the MRO.

To comply with the regulations, the Gas Company contracted with Executive Health Group for MRO services. Through Executive Health, Gerald Barnes, a person whom all parties concerned believed to be a licensed physician, was assigned to perform MRO services for the Gas Company from mid-July 1995 to October 1995.

In 1995, Wilson and Daniel were employed in the position of crew assistant, a safety-sensitive position subject to random drug testing under the DOT's regulations. Both were administered random tests which, according to Barnes, showed positive results for prohibited drugs. After Barnes consulted with Daniel and Wilson, he reported the results to the Gas Company. Both were immediately terminated pursuant to the parties' agreement that anyone with fewer than fifteen years of seniority would suffer termination upon a first positive drug test. During the time Barnes served as the MRO, he also reported positive test results for nine other employees.

In April 1996, federal law enforcement authorities arrested Barnes for impersonating a licensed physician. He pleaded guilty to charges of mail fraud and illegally dispensing controlled substances. In the wake of Barnes' arrest, the Gas Company and the Union met to discuss how to resolve the problem of Barnes' masquerade as a doctor and the impact Barnes had on the affected employees.

Prior to Barnes' arrest, the Gas Company had changed the company with which it contracted for MRO services. Consequently, a new MRO, Dr. Murray Lappe, took over the review of the Gas Company's drug tests. The Gas Company contends that, after Barnes' arrest, the Union agreed to allow Dr. Lappe to review Barnes' notes and the aggrieved employees' urine samples. It maintains that the Union agreed to accept those results as conclusive of whether the discharges made as a result of Barnes' reporting were proper.

In August 1996, Dr. Lappe reviewed the Appellants' earlier test results. He determined that the results were, in fact, valid. Although the Gas Company believed this ended the matter, the Union continued to press for reinstatement. While a dispute arose as to whether the Union waived its right to arbitrate on the Appellants' behalf because of its purported agreement to allow Dr. Lappe to confirm Barnes' results, the parties eventually agreed to have an impartial arbitrator resolve the following overarching issue:

> With respect to each grievant, did the Company violate the parties' collective bargaining agreement when it discharged [Daniel and Wilson]? If so, each grievant shall be reinstated and made whole; if not, their grievances shall be denied.

The three narrow issues before the arbitrator were: 1) whether the Union waived its contractual right to pursue the grievances by agreeing to a specific process of responding to the dilemma caused by the imposter Barnes; 2) if not, did the Gas Company comply with applicable federal regulations requiring review of positive test results by an MRO by having the grievants' results reviewed by a new, qualified MRO or is the Gas Company precluded from relying on the positive test results because they were first reviewed by an imposter; and 3) were the grievants' urine samples obtained in such a manner as to cast serious doubt on the reliability of the positive test results?

As to the first issue, the arbitrator heard evidence from the parties and found that the Union did not waive its right to challenge Appellants' terminations due to an alleged violation of the applicable federal regulations governing drug testing.[1]

---

1. The dissent's characterization of the parties' pre-arbitration agreement to have the Appellants' test results verified by a "third MRO whose decision would be final" finds no basis in the record. The parties disputed whether the Union agreed to waive its right to arbitra-

Second, the arbitrator concluded that the Gas Company failed to comply with the strict requirements of the federal regulations regarding DOT drug testing and that Dr. Lappe's later review did not cure the defect. The arbitrator did not reach the third issue. Based on the favorable finding as to the second issue, the Gas Company was ordered to reinstate and "make whole" both Appellants.

The Gas Company thereafter moved to vacate the award in district court. It also sought a stay of Appellants' reinstatement and the Gas Company's obligation to award back pay. The district court denied the company's motion to vacate, granted the motion for stay as to the back pay, but denied it as to reinstatement. Accordingly, Daniel and Wilson returned to work at the Gas Company subject to their agreement to submit to a drug test before returning to duty.

## II.

It is well-settled that federal labor policy favors the resolution of disputes through arbitration; thus, judicial scrutiny of an arbitrator's decision is *extremely* limited. *Stead Motors v. Auto. Machinists Lodge*, 886 F.2d 1200, 1208 n. 8 (9th Cir. 1989) (en banc). We review de novo a district court's decision confirming an arbitration award. *Hawaii Teamsters and Allied Workers Union, Local 996 v. United Parcel Serv.*, 241 F.3d 1177, 1180–81 (9th Cir.2001).

tion, thus making any future review "final." In fact, this issue was submitted to the arbitrator for resolution. The arbitrator explained, "[w]ith respect to the waiver issue, the parties introduced conflicting evidence on their respective understandings of what they 'agreed' to following discovery of Barnes' fraud." The arbitrator found that the Union did not waive its contractual right to grieve

In reviewing an arbitral award, "[c]ourts ... do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Id.* (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)). If an " 'arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' the fact that 'a court is convinced he committed serious error does not suffice to overturn his decision.' " *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (quoting *Misco*, 484 U.S. at 38, 108 S.Ct. 364). Only where the arbitrator ignores the contract's plain language, choosing instead to dispense his own brand of industrial justice, may we question his judgment. *Teamsters Local Union 58 v. Boc Gases*, 249 F.3d 1089, 1093 (9th Cir.2001).

## III.

The Gas Company seeks to vacate the arbitration award pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185. While we accord an arbitrator's decision a "nearly unparalleled degree of deference," *Stead Motors*, 886 F.2d at 1205, we have identified narrow exceptions to that general rule. Vacatur of an arbitration award under section 301 of the LMRA is warranted: (1) when the award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing

the discipline imposed by agreeing to have the test results resubmitted to Dr. Lappe. In so doing, the arbitrator rejected the Gas Company's suggestion that the parties' agreement to submit the test to a qualified MRO would end the matter. Therefore, discussion of the parties' pre-arbitration agreement is simply a red herring.

his own brand of industrial justice; (2) where the arbitrator exceeds the boundaries of the issues submitted to him; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud. *See SFIC Properties, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. Lodge 94,* 103 F.3d 923, 925 (9th Cir.1996). The Gas Company challenges the award under the first and third grounds. We find both contentions to be without merit.

■ The Gas Company first argues that the arbitration award does not "draw its essence" from the CBA because it provides for the immediate termination of employees with fewer than 15 years of seniority who test positive for prohibited drugs. The Gas Company contends that because the arbitrator opined that Daniel and Wilson were, in fact, drug users, the arbitrator had no choice but to uphold Appellants' terminations under the CBA.

The Gas Company's argument misses the mark. The relevant issue before the arbitrator was *not* whether Daniel and Wilson had in fact taken prohibited drugs, but rather whether their drug tests were properly administered so as to justify the loss of their jobs. At the arbitration hearing, the parties stipulated that they had agreed, effective March 1994, that an employee who tested positive *on a random DOT drug test,* and who had been in the Company's service fewer than 15 years, would be terminated.

The clear import of this agreement, as the arbitrator understood it, is that an employee must fail a drug test given in accordance with DOT procedures in order to be subject to discipline. To "fail a drug test" under 49 C.F.R. § 40 means "that the confirmation test result shows positive evidence of the presence *under DOT Procedures* of a prohibited drug in an employee's system." *Id.* (emphasis added).

Since the arbitrator found that the DOT procedures were not complied with in the tests' administration, he deemed the Appellants' terminations to be unwarranted under the parties' agreement.

The Gas Company would have the arbitrator ignore the DOT regulations in upholding the Appellants' discharge. In so doing, the Gas Company places undue emphasis on the arbitrator's statement that "the evidence overwhelmingly demonstrates that the grievants in this case had, in fact, taken illegal drugs." That the arbitrator gratuitously offered his opinion regarding the Appellants alleged drug use is irrelevant. The arbitrator was not charged with making a factual "finding" regarding such drug use. In this vein, it is worth noting that the arbitrator is no more a licensed physician than was "Dr. Gerald Barnes." Neither is qualified, under DOT regulations, to confirm the presence of prohibited drugs from a urine sample, nor is that what the parties asked the arbitrator to determine.

The relevant issue for determination required the arbitrator to draw a legal conclusion regarding whether the Gas Company followed DOT procedures in testing the Appellants before it discharged them. The issue was as follows:

> [D]id the Company comply with applicable federal regulations requiring review of positive test results by a medical review officer (MRO) by having the grievants' results reviewed by a new, qualified MRO or is the Company precluded from relying on the positive test results because they were first reviewed by an imposter?

The arbitrator unequivocally decided that "the later review of the test results by Lappe could not and did not cure the defect caused by their initial review and certification by the imposter Barnes."

This refusal to excuse the initial mishap was based upon the arbitrator's reading of the "plain and unambiguous language" of 49 C.F.R. § 40.33(a)(1) governing MRO review. Consequently, the arbitrator affirmed the Union's position that "the Regulation is clear: it requires certification of a positive test by a licensed physician (the MRO) *before* the Company is told and therefore *before* discipline is imposed."

At the same time, the arbitrator rejected the Gas Company's "no harm, no foul" argument that Daniel and Wilson were not harmed by the imposter's certification in light of a later re-test by a qualified MRO. The arbitrator resolved this question by examining the reasons why a positive test result must be reviewed by a qualified physician before the Gas Company takes action. Noting that "[r]andom drug testing is, of course, a serious invasion of a person's privacy," the arbitrator considered the grievous effect a false positive result could have on a person's livelihood.

Finally, the arbitrator rejected the Gas Company's arguments that the grievances should be denied because it "substantially complied" with the drug regulations. As the arbitrator noted, adopting a substantial compliance standard would create a slippery-slope which could eventually have the effect of undermining the interests the procedural requirements are designed to protect.

The dissent's ultimate concern in this case echoes that of the arbitrator's here. Reluctantly finding in the Appellants' favor, the arbitrator stated:

> I am frank to admit, however, that sustaining these grievances is troubling. I have little doubt that both grievants had the illegal substances in question in their bodies, based on the evidence presented, and I am not particularly happy about ordering them reinstated. That outcome, however, is compelled by the clear

language of the Regulation, by the policies underlying the MRO review, and by the problems posed by a "substantial compliance" interpretation.

But, as the arbitrator's final decision reflects, whether the arbitrator had "little doubt" about the employees' purported drug use is neither here nor there. The arbitrator found that, under the parties' agreement, the Appellants were entitled to have the Gas Company follow the DOT's drug testing procedures before imposing discipline. While the Gas Company may view the Barnes debacle as an easily-correctable, technical deviance from mandated procedures, the arbitrator did not. This is precisely the type of legal conclusion which a court may not disturb. As the Supreme Court recently reiterated, "[c]ourts are not authorized to review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement." *Major League Baseball Players Association v. Garvey*, 532 U.S. 504, 121 S.Ct. 1724, 1728, 149 L.Ed.2d 740 (2001) (citing *Misco*, 484 U.S. at 36, 108 S.Ct. 364). Because we agree that the arbitrator's decision "drew its essence" from the parties' agreement, we affirm as to this ground.

### IV.

We turn to the Gas Company's argument that the arbitration award must be vacated because it is contrary to public policy. "[T]he question of public policy is ultimately one for resolution by the courts." *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169, 174 (9th Cir. 1995) (quoting *Misco*, 484 U.S. at 43, 108 S.Ct. 364 (quotations omitted)). While a court should be reluctant to do so, it may vacate an award for violating a public policy that is "explicit," "well-defined," and

"dominant" as "ascertained by reference to the laws and legal precedents and not from general considerations of proposed public interest." *Misco,* 484 U.S. at 42, 108 S.Ct. 364. The court must focus on the award itself, not the behavior or conduct of the party in question. In this case, for example, the court's inquiry is not whether drug use in a safety-sensitive position violates some public policy, but rather whether Daniel's and Wilson's *reinstatement* pursuant to the arbitration award contravenes some explicit, well-defined, and dominant public policy. *See Eastern Assoc. Coal Corp.,* 121 S.Ct. at 467, 121 S.Ct. 462; *Stead Motors,* 886 F.2d at 1212. In other words, to vacate an award on public policy grounds, the court must find that "the policy is one that specifically militates against the relief ordered by the arbitrator." *Stead Motors,* 886 F.2d at 1212–1213.

■ The Gas Company contends that the "unconditional reinstatement" of an employee who fails a drug test runs contrary to an "explicit, well-defined and dominant public policy" such that the arbitrator's decision should be overturned. *Stead Motors,* 886 F.2d at 1212. In support of its argument, the Gas Company cites a DOT regulation, applicable to this case, which provides that "[a]n operator may not knowingly use as an employee any person who fails a drug test required by this part and the medical review officer makes a determination [that no legitimate medical explanation for the confirmed positive test result exists]." 49 C.F.R. § 199.9(a)(1).

We find the Gas Company's argument to be misguided. Accepting it would require us to find that the Appellants in fact "failed a drug test" under the DOT's regulations. Under the regulations, this initial premise is unsound.

To "fail a drug test" under 49 C.F.R. § 40 means "that the confirmation test result shows positive evidence of the presence *under DOT Procedures* of a prohibited drug in an employee's system." *Id.* (emphasis added). The regulations make it clear that, in order to fail a drug test, the test must be valid under DOT procedures. The employer is responsible under the regulations for ensuring compliance with those procedures. Here, no one disputes that the proper procedures were not followed in the first instance. The Gas Company argues that, notwithstanding the mishap with the phony doctor, Daniel and Wilson *essentially* failed their drug tests because a qualified MRO later confirmed that Daniel and Wilson had taken prohibited drugs. The Gas Company therefore contends that it is against public policy to employ Daniel and Wilson based upon the DOT's prohibition against an employer "knowingly us[ing] as an employee any person who fails a drug test."

The problem with this argument is that it has no logical end. The DOT prohibits an employer from knowingly employing a person who fails a drug test that *the DOT specifically requires.* The DOT set up the procedures that *must* be followed before a person can be branded a "confirmed drug user." It is only through these carefully-crafted procedures that an employer may gain access to information regarding its employees' drug use. If the procedures are not followed, a person is not deemed to have failed a drug test, under the regulations, and there is no prohibition against employing him. If a "substantial compliance" standard were adopted, there would be no way to draw the line as to the circumstances under which it could be said that an employee has "failed a drug test" under the DOT regulations. The exceptions would inevitably swallow the regulations.

■ Furthermore, the DOT regulations at issue do not exist in a vacuum.

Once the government requires an employer to administer random drug tests to a certain class of workers, the Fourth Amendment is implicated; thus, the "search" effected by a urine test is subject to the Fourth Amendment's reasonableness requirement. *See Skinner v. Railway Labor Executives' Assoc.*, 489 U.S. 602, 615–617, 634, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) ("Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, ... these intrusions must be deemed searches under the Fourth Amendment."). To excuse non-compliance with the regulations-or to adopt a substantial compliance standard-may have the unintended effect of vitiating an individual's Fourth Amendment rights. In *Skinner*, the Supreme Court found government-mandated drug testing of safety-sensitive employees to be *reasonable* under the Fourth Amendment, in part, because of the "limited discretion exercised by ... employers under the [government-mandated] regulations." *Skinner*, 489 U.S. at 634, 109 S.Ct. 1402. Thus, ensuring that the guidelines are followed vindicates a competing policy concern.

The dissent cites *Eastern Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 U.S. 57, 121 S.Ct. 462; 148 L.Ed.2d 354 (2000) and *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms*, 74 F.3d 169 (9th Cir.1996), in support of its argument that we should vacate the arbitration award on public policy grounds. Both cases are inapposite. *Eastern Associated* involved the reinstatement of employees whose positive drug tests indisputably *complied* with all regulatory procedures. 121 S.Ct. at 465–66. And, in *Foster Poultry*, while one employee initially disputed whether proper procedures were followed for his random drug test, that was not an issue in the case.

Instead, the court examined whether it was appropriate for the arbitrator to reinstate two employees based on the fact that the employer refused to bargain with the Union over the non-mandatory and discretionary aspects of its drug testing program. The court ultimately concluded that the DOT regulations (governing commercial truck drivers) "do not express an explicit, well-defined and dominant public policy permanently enjoining the employment of commercial motor vehicle drivers who test positive for drug use." 74 F.3d at 174 (internal quotations omitted). The court did not address the question whether public policy militates against reinstating an employee whose drug test did not technically comply with all government-mandated procedures.

Here, no one disputes that the Appellant's testing did not comply with all applicable DOT procedures. Indeed, the Gas Company concedes as much by arguing that it "substantially complied" with the regulations. In this regard, we respectfully disagree with the dissent's characterization of Wilson and Daniel as "confirmed drug users" because neither failed a drug test as defined in the DOT regulations.

The party seeking to vacate the arbitration award bears the burden of showing that the award violates public policy. *Foster Poultry*, 74 F.3d at 175. Applying the proper framework here, the question presented is whether an explicit and well-defined public policy prohibits the reinstatement of two employees whose drug tests did not comport with DOT regulations. Neither the Gas Company nor the dissent has pointed to any authority which identifies such a public policy, and we have found none. Accordingly, we reject the Gas Company's challenge to the arbitral award on public policy grounds.

We note that the Appellants agreed to submit to DOT drug tests before returning to duty. And, of course, nothing in the arbitrator's remedy changes the Appellants' continuing obligations to submit to random tests. Thus, the dissent's fear that we are returning confirmed drug users to safety-sensitive positions is unfounded in all respects.

## V.

We take very seriously the dissent's concern over employing "confirmed drug users" in safety-sensitive positions. But that is not the case here. In this case, the parties explicitly agreed, and the DOT regulations mandate, that random drug tests to which Gas Company employees are required to submit must comply with DOT procedures. The arbitrator found that Daniel and Wilson were entitled to return to work because the random drug tests which led to their discharge were invalid under those government-mandated procedures. "Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept." *Misco*, 484 U.S. at 37–38, 108 S.Ct. 364. Furthermore, the arbitrator's award does not violate any explicit, well-defined, and dominant public policy. Accordingly, we **AFFIRM**.

ALARCON, Circuit Judge, dissenting:

The majority's holding today upholds the unconditional reinstatement of two confirmed drug users to their safety-sensitive positions as pipeline crew assistants for Southern California Gas Company. Because this result directly conflicts with the clear language of the applicable collective bargaining agreement and violates firmly established public policies against such reinstatement, I respectfully dissent.

## I

The following facts are undisputed. Southern California Gas Company ("Company") hired Lorenza Wilson ("Wilson") and Gerry Daniel ("Daniel") in 1983 and 1984 respectively. In 1990, the Company implemented random drug testing of its employees, to be conducted pursuant to Department of Transportation ("DOT") regulations. The Utility Workers Union of America, Local 132, AFL–CIO ("Union"), reserved the right to arbitrate any allegations that the random drug test policy violated DOT regulations. The Union and the Company subsequently agreed that employees shall be terminated immediately after "their first positive test, on random or for cause, with no offer of rehabilitation being extended unless the employee has 15 or more years of service with the Company. In those cases rehabilitation will be offered on a one-time basis." The parties agree that this provision became a part of the operative collective bargaining agreement ("CBA").

In 1995 Wilson and Daniel worked for the Company as pipeline crew assistants. The position of crew assistant is safety sensitive. Consequently, Wilson and Daniel were subject to DOT random drug testing. On October 3, 1995, Wilson tested positive for cocaine metabolites pursuant to a random drug test. Daniel tested positive for marijuana, amphetamines, and methamphetamines on August 22, 1995, also pursuant to a random drug test. The laboratory analyzed both urine specimens according to proper procedures and neither Wilson nor Daniel contest the validity of the test results.

After the laboratory determined that Daniel and Wilson's drug tests were positive, it sent the results for evaluation by

Gerald Barnes ("Barnes"), as required pursuant to 49 C.F.R. § 40.33(a)(1).[1] Barnes notified the Company that there was no legitimate explanation for the confirmed positive test results other than the unauthorized use of illegal drugs. As required by the CBA, the Company terminated Daniel and Wilson with no offer of rehabilitation because each of them had worked for the Company for less than fifteen years.

The Company contracted with Executive Health Group to provide MRO services. Barnes was designated by Executive Health Group to perform MRO services for the Company from mid-July to October 1995. After its contract with Executive Health Group expired, the Company contracted with Dr. Murray Lappe to perform MRO services. Approximately three months later federal law enforcement authorities arrested Barnes for impersonating a licensed physician and illegally dispensing controlled substances.[2]

Upon learning of Barnes' fraudulent representations of his qualifications, the Company notified the Union that Barnes was not a licensed physician.[3] The Company and the Union met to consider the steps that should be taken to remedy the problem caused by the discovery that Barnes was not qualified to review the laboratory findings. The Company and the Union agreed to the following procedure:

> Barnes' notes would be sent to the affected employees and Dr. Lappe; Lappe would then contact each employee to explore the possibility of a false positive; if the Union disagreed with his conclusions, it could hire its own MRO to reach an independent conclusion, and that if the Union's MRO and Dr. Lappe disagreed, they would find a third MRO whose decision would be final. That decision, whether Lappe's or the third MRO, would be forwarded to the Company for appropriate action.

Dr. Lappe reported to the Company that there was no legitimate medical explanation for Daniel and Wilson's positive drug test results other than their use of illegal drugs. Accordingly, the Company did not reinstate Daniel and Wilson.

Notwithstanding the fact that Dr. Lappe confirmed that Daniel and Wilson had tested positive for drug use, the Union insisted that the Company reinstate Daniel and Wilson. The matter proceeded to arbitration. The Union argued that Daniel and Wilson were entitled to reinstatement

---

1. DOT regulations require that a medical review officer ("MRO") conduct "a final review of confirmed positive results from the laboratory . . . . prior to the transmission of the results to employer administrative officials." 49 C.F.R. § 40.33(a)(1). The regulations further provide:

   The role of the MRO is to review and interpret confirmed positive test results obtained through the employer's testing program. In carrying out this responsibility, the MRO shall examine (continued) (continued) alternate medical explanations for any positive test result. This action may include conducting a medical interview and review of the individual's medical history, or review of any other relevant biomedical factors. The MRO shall review all medical records made available by the tested individual when a confirmed positive test could have resulted from legally prescribed medication. The MRO shall not, however, consider the results or urine samples that are not obtained or processed in accordance with this part. 49 C.F.R. § 40.33(b)(3).

2. Apparently, a real Dr. Gerald Barnes exists, whom the false Dr. Barnes impersonated. The real Dr. Barnes is not an MRO and has nothing to do with this case.

3. The regulations provide in pertinent part: "MRO qualifications. The MRO must be a licensed physician with knowledge of drug abuse disorders." 49 C.F.R. § 199.15(b).

because the drug test results were reported to the Company *before* the positive tests were certified by a licensed MRO. The Company countered that, in light of their confirmed drug use, Wilson and Daniel had not been harmed by the fact that Barnes was not qualified to interpret the undisputed positive results of the tests. The Company maintained that the subsequent review by a qualified MRO rendered insubstantial the alleged procedural defect caused by Barnes' lack of a medical license.

At the arbitration hearing, Daniel and Wilson denied having used illegal drugs. Instead, they alleged that their urine samples were tampered with because the laboratory left them unattended. The parties stipulated, however, that the independent laboratory that tested the specimens followed the required protocol. The arbitrator wholly rejected Wilson and Daniel's contentions concerning the accuracy of the drug test results. The arbitrator concluded that Wilson and Daniel lied under oath when they denied their drug use, finding that there was "little doubt that both grievants had the illegal substances in question in their bodies[.]"[4] Nevertheless, the arbitrator opined that he "did not see any way around [the] clear language" of 49 C.F.R. § 40.33(a)(1), requiring that test results be "reviewed by a qualified physician before the Company takes action." The arbitrator ordered the unconditional reinstatement of Wilson and Daniel to their safety-sensitive positions because

the Company did not strictly comply with the DOT regulations.

The Company filed a petition in district court to vacate the arbitrator's award. It alleged that the arbitrator's order violates public policy and does not "draw its essence" from the CBA. The district court rejected both claims, holding first that the "outright reinstatement" of Wilson and Daniel did not violate public policy. Second, the district court held that the arbitrator's award drew its essence from ·the CBA because "as employees whose drug tests were not carried out in compliance with DOT regulations, Daniel and Wilson [were] therefore not covered by the provision of the CBA providing for mandatory termination of employees with less than 15 years' seniority who fail a drug test carried out in compliance with DOT regulations." This timely appeal followed.

II

The district court had jurisdiction to hear the Company's petition to vacate the arbitrator's order pursuant to 29 U.S.C. § 185. We have jurisdiction under 28 U.S.C. § 1291. We review a district court decision refusing to vacate an arbitration award using the same standard applied to "any other district court decision finding an agreement between the parties." *First Options of Chicago v. Kaplan*, 514 U.S. 938, 947–48, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). We must accept findings of fact unless they are clearly erroneous and decide questions of law de novo. *Id.* at

---

**4.** The majority attempts to cast doubt on Wilson and Daniel's drug use by characterizing the arbitrator's determination that Wilson and Daniel had used illegal drugs as a "gratuitous[ ] ... opinion" that he was unqualified to render without medical training. Surely the arbitrator was qualified to accept the parties' stipulation that the laboratory had followed protocol in testing Daniel and Wilson's specimens. Moreover, as a fact-finder, the

arbitrator was uniquely qualified to evaluate the credibility of witnesses and determine that Wilson and Daniel lied under oath when they denied having used drugs. Finally, Dr. Lappe's qualifications are not in dispute. Dr. Lappe concluded that Daniel and Wilson's test results could only be explained by illegal drug use. There is simply no question that Daniel and Wilson used illicit substances.

948, 115 S.Ct. 1920. "[C]ourts will set aside the arbitrator's interpretation of what their agreement means only in rare instances." *E. Associated Coal Corp. v. United Mine Workers, Dist. 17,* 531 U.S. 57, 121 S.Ct. 462, 466, 148 L.Ed.2d 354 (2000). However, "an arbitrator's award is not bulletproof." *Hawaii Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv.,* 241 F.3d 1177, 1182 (9th Cir. 2001). There are "three exceptions to the general deference to an arbitrator's award: (1) when the award does not 'draw its essence from the collective bargaining agreement'; (2) when the arbitrator exceeds the scope of the issues submitted; and (3) when the award runs counter to public policy." *SFIC Properties, Inc. v. Int'l Assoc. of Machinists & Aerospace Workers, Local Lodge 311,* 103 F.3d 923, 925 (9th Cir.1996). Under the undisputed facts summarized above, we are required to vacate the arbitrator's award because it does not draw its essence from the collective bargaining agreement and it flagrantly violates public policy in exposing members of the public to serious injury or death as a result of the conduct of drug abusing employees holding safety-sensitive positions in the gas pipeline industry.

### III

An arbitrator's award "must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice." *E. Associated Coal,* 121 S.Ct. at 466 (quoting *United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)); *United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms,* 74 F.3d 169, 172 (9th Cir.1995). "The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning of the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract." *Misco,* 484 U.S. at 38. An "arbitrator's determination must be a 'plausible interpretation' of the CBA." *Ass'n of W. Pulp & Paper Workers, Local 78 v. Rexam Graphic, Inc.,* 221 F.3d 1085, 1090 (9th Cir.2000). Plainly, "[a]n award that conflicts directly with the contract cannot be a 'plausible interpretation.'" *Frederick Meiswinkel, Inc. v. Laborer's Union Local 261,* 744 F.2d 1374, 1377 (9th Cir.1984) (quoting *Pac. Motor Trucking v. Auto. Machinists Union,* 702 F.2d 176, 177 (9th Cir.1983)).

Here, the arbitrator's award conflicts directly with the text of the CBA and thus cannot be considered a "plausible" interpretation. As amended, the CBA requires "terminat[ion of] employees immediately after their first positive drug test, on random or for cause, with no offer of rehabilitation being extended unless the employee has 15 or more years of service with the Company." The evidence is undisputed that Daniel and Wilson tested positive for drug use. Therefore, Daniel and Wilson were subject to immediate termination pursuant to the express terms of the CBA. By ordering the Company to reinstate Daniel and Wilson, the arbitrator "blatantly ignored the unambiguous language" of the CBA "and fashioned a modified penalty that appealed to his own notions of right and wrong." *Mountaineer Gas Co. v. Oil, Chem. & Atomic Workers Int'l Union,* 76 F.3d 606, 610 (4th Cir.1996). The arbitrator lacked authority to create an exception to the "one-strike-and-you're-out" language of the CBA.

Not only did the arbitrator's award violate the terms of the CBA, but the reasoning underlying his award makes it abundantly clear that he did not interpret the contract at all. *See Hill v. Norfolk & W. Ry. Co.,* 814 F.2d 1192, 1194–95 (7th Cir.

1987) ("As we have said too many times to want to repeat again, the question for decision by a federal court asked to set aside an arbitration award ... is not whether the arbitrator or arbitrators erred in interpreting the contract ... it is whether they interpreted the contract.") An award that does not concern the contract at issue can hardly be considered "a plausible interpretation" of the contract. *Cf. United Steelworkers v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960) ("[S]o far as the arbitrator's decision *concerns construction of the contract*, the courts have no business overruling him because their interpretation of the contract is different from his." (emphasis added)).

Here, the arbitrator initially framed the issue presented for arbitration as follows: "[D]id the Company violate the parties' collective bargaining agreement when it discharged [the grievants]?" Thereafter, the arbitrator narrowed the specific inquiry to the following question:

> [H]as the Company complied with *applicable federal regulations* requiring review of positive test results by a medical review officer (MRO) by having the grievants' results reviewed by a new MRO or is the Company precluded from relying on the positive test results because they were first reviewed by an imposter?

Without further reference to the text of the CBA, the arbitrator proceeded to dispense his own brand of industrial justice

by offering an interpretation of *DOT regulations* that he felt best allocated the risk of an initial noncompliance with the review of drug test results by a qualified MRO.

In reaching the conclusion that reinstatement was warranted, the arbitrator relied primarily on 49 CFR § 40.33(a)(1). Section 40.33(a)(1) provides:

> An essential part of the drug testing program is the final review of confirmed positive results from the laboratory. A positive test result does not automatically identify an employee/applicant as having used drugs in violation of a DOT agency regulation. An individual with a detailed knowledge of possible alternate medical explanations is essential to the review of results. This review shall be performed by the Medical Review Officer (MRO) prior to the transmission of the results to employer administrative officials. The MRO review shall include review of the chain of custody to ensure that it is complete and sufficient on its face.

49 CFR § 40.33(a)(1). The Union persuaded the arbitrator that this regulation "requires certification of a positive test by a licensed physician (the MRO) *before* the Company is told and therefore *before* discipline is imposed." The arbitrator also relied on the opinion of DOT Deputy Assistant General Counsel, Robert C. Ashby ("Ashby"). Ashby opined that the timing of the reporting requirement was essential to the purpose of the regulations.[5] In

---

**5.** The Union submitted Ashby's opinion into evidence in the form of an internal DOT memorandum written by Ashby to Catrina Pavlik, Drug Program Manager for the Research and Special Programs Administration. The Company submitted the opinion of Richard B. Felder, Associate Administrator for the Office of Pipeline Safety at DOT. Felder found "no fault with the fairness of [the] process" the Union and the Company put in place to resolve the problem caused by Barnes. In addi-

tion, the Company submitted the opinion of Harry Strahl, Acting Chief of the Utilities Branch of the California Public Utilities Commission. Strahl concluded that the process to which the Union and Company agreed "addresses our concerns for employee and public safety and that it complies with Title 49 of the Code of Federal Regulations, Parts 40 and 199." The arbitrator did not explain why he was unpersuaded by Felder and Strahl's opinions on the matter.

addition, the arbitrator considered "the consequences of accepting the Company's position on this issue." Specifically, the arbitrator stated that:

> [T]he risk of noncompliance with the Regulations is best placed on the employer, rather than on the employees. It is best placed on the employer because the employer is in the better position, relative to the Union or the employees, to control the risk by insisting on strict adherence to all procedural requirements.

Finally, the arbitrator rejected the Company's substantial compliance argument on the ground that it "poses the danger of opening up other procedural requirements to a similar test which could, over time, undermine the interests those procedural requirements are designed to protect. It could also lead to wasteful disputes whenever a regulatory requirement, without any fault, was not strictly complied with." In sum, rather than interpreting the CBA, the arbitrator examined the DOT regulations, concluding that he "[did] not see any way around" the "clear language" of 49 C.F.R. § 40.33(a)(1).

To be sure, the Supreme Court has recognized that "[t]he labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). This is because "[g]aps may be left to be filled in by reference to the practices of the particular industry and of the various shops covered by the agreement." *Id.* at 580, 80 S.Ct. 1347. Here, however, the CBA does not leave a gap that needed to be filled under the facts of this case, nor does the CBA refer to the DOT regulations the arbitrator considered. Instead, the CBA unambiguously mandates immediate termination of an employee who has served less than fifteen years if he or she tests positive for drug use. Because there is no ambiguity in the words used by the parties to the CBA, it was improper for the arbitrator to look for clarification in the DOT regulations. This error is particularly egregious in this case because the arbitrator reached a result that directly conflicts with the plain words of the agreement of the parties.

I recognize that "[j]udicial scrutiny of an arbitrator's decision is extremely limited[,]" *Sheet Metal Workers Int'l Assoc., Local No. 359 v. Arizona Mech. & Stainless, Inc.*, 863 F.2d 647, 653 (9th Cir.1988), and that "[a]rbitrators have no obligation to the court to give their reasons for an award." *Enter. Wheel & Car Corp.*, 363 U.S. at 598, 80 S.Ct. 1358. Surely, however, we are not required to ignore the detailed rationale an arbitrator does offer, in the name of deference to the arbitral system. Here, the arbitrator did not interpret the CBA. Instead, he concocted his own interpretation of DOT regulations. Section 40.33(a)(1) does not require an employer to ignore a positive test result after a qualified MRO has confirmed its validity simply because an earlier notification of the positive test results was reported to the employer by an unqualified MRO. The reasoning of the arbitrator's award is as unambiguous as the text of the CBA. A comparison of the two makes clear that the arbitrator's award did not "draw its essence" from the CBA. By upholding the arbitrator's award, the majority extends deference to an illogical extreme, effectively rendering the arbitrator's award impervious to review.

## IV

We are also required to vacate an arbitrator's award if it violates public policy.

It is well settled that "a court may not enforce a collective bargaining agreement that is contrary to public policy." *W.R. Grace & Co. v. Local Union 759, Union of the United Rubber Workers,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). "Any such public policy must be 'explicit,' 'well defined,' and 'dominant.'" *E. Associated Coal Corp.,* 121 S.Ct. at 467 (quoting *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. 2177). "It must be 'ascertained "by reference to the laws and legal precedents and not from general considerations of supposed public interests."'" *Id.* (quoting *W.R. Grace & Co.,* 461 U.S. at 766, 103 S.Ct. 2177). A "court['s] authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law." *Id.* Federal regulations are a significant source for determining what constitutes explicit well-defined public policy. *Foster Poultry Farms,* 74 F.3d at 174; *E. Associated Coal,* 121 S.Ct. at 467 ("[W]here two political branches have created a detailed regulatory regime in a specific field, courts should approach with particular caution pleas to divine further public policy in that area.")

"[O]f course, the question to be answered [in this case] is not whether [Daniel and Wilson's] drug use itself violates public policy, but whether the agreement to reinstate [them] does so." *E. Associated Coal,* 121 S.Ct. at 467. Specifically, our task is to determine whether an explicit public policy militates against the unconditional reinstatement of employees to safety-sensitive positions who have tested positive for illegal drugs. *Stead Motors of Walnut Creek v. Int'l Assoc. of Machinists & Aerospace Workers,* 886 F.2d 1200, 1212–13 (9th Cir.1989) (en banc) ("A court ... must demonstrate that the policy is one that specifically militates against the relief ordered by the arbitrator.") Unlike the majority, I am convinced that the policies embodied in the DOT regulations require us to vacate the arbitrator's award.

### A.

First, the DOT regulations militate against reinstating confirmed drug users. DOT regulations provide that "(a) An operator may *not knowingly use as an employee* any person who—(1) *Fails a drug test* required by this part and the medical review officer makes a determination under § 199.15(d)(2)." 49 C.F.R. § 199.9(a)(1) (emphasis added).[6] The policy behind this regulation is clear. Once an employee fails a drug test and an MRO confirms that the test is a true positive, he or she may not be used as an employee in any capacity. Both Wilson and Daniel failed a drug test and their results were reviewed by Dr. Lappe, a qualified MRO. Therefore, the policy embodied by section 199.9(1)(a) unmistakably militates against their reinstatement.[7]

---

**6.** 49 C.F.R. § 199.15(d)(2) provides:

if the MRO determines, after appropriate review, that there is no legitimate medical explanation for the confirmed positive test result other than the unauthorized use of a prohibited drug, the MRO shall refer: (i) The individual tested to a personnel or administrative officer for further proceedings in accordance with the operator's anti-drug plan; and (ii) For evaluation by a SAP who shall determine what assistance, if any, the employee needs in resolving problems associated with drug misuse.

**7.** The regulations provide one exception to this rule:

(b) Paragraph (a)(1) of this section does not apply to a person who has—(1) Passed a drug test under DOT procedures; (2) Been recommended by the medical review officer for return to duty in accordance with § 199.15(c); *and* (3) Not failed a drug test required by this part after returning to duty. 49 C.F.R. § 199.9(b) (emphasis added). Neither Wilson nor Daniel meet the three requirements of this exception, which would permit them to avoid immediate termination.

This conclusion is bolstered by an examination of two relevant cases. First, in *Eastern Associated Coal,* the Supreme Court examined DOT regulations evincing a "strong public policy against *drug use* by transportation workers in safety-sensitive positions and in favor of random drug testing in order to detect that use." 121 S.Ct. at 468 (emphasis added). For example, the regulations "*mandate[ ] suspension* of those operators who have driven a commercial motor vehicle while under the influence of drugs[,]" and "set forth sanctions applicable to those who test positive for illegal drugs." *Id.* at 467–68 (citing 49 U.S.C. §§ 31310(b)(1)(A), 31310(c)(2) and 49 C.F.R. § 382.605 (1999)). After reviewing all of the applicable regulations, the Court concluded that "[n]either Congress nor the Secretary has *seen fit to mandate the discharge of a worker* who twice tests positive for drugs. We hesitate to infer a public policy in this area that goes beyond the careful and detailed scheme Congress and the Secretary have created." *Id.* at 469 (emphasis added).

In this case, the applicable regulations do much more than "mandate suspension," or "set forth sanctions for those who test positive for illegal drugs." Unlike the regulations at issue in *Eastern Associated Coal,* the DOT regulations mandate the discharge of a person employed in a safety-sensitive position after his or her first positive drug test, subject to a narrow exception not applicable in this case. 49 C.F.R. § 199.9(a)(1).

Similarly, in *Foster Poultry Farms,* this circuit examined whether an arbitration award reinstating two employees who tested positive for drugs "violates the alleged public policy embodied in the [DOT regulations] mandating various forms of drug testing." 74 F.3d at 171. Under the applicable regulations, "any person who tests positive for drug use . . . shall be 'medically unqualified' *to operate a commercial motor vehicle.*" *Id.* (quoting 49 C.F.R. §§ 391.95(b) and (c), 391.97) (emphasis added). We concluded in *Foster Poultry Farms* that the DOT regulations "do not require an employer to terminate an employee who tests positive for drug use. The regulations only prohibit an employee from driving a commercial motor vehicle." *Id.* We held that "[b]ecause the DOT regulations do not make it illegal to reinstate employees who test positive for drug use, it *cannot* be said that the DOT regulations 'specifically militate [ ] against the relief ordered by the arbitrator' in this case." *Id.* at 174.

In stark contrast to the regulations interpreted in *Foster Poultry Farms,* the regulations here do not merely disqualify drug users from performing certain tasks. Rather, they mandate discharge. Thus, the arbitrator's award converting Wilson and Daniel's discharges into temporary suspensions violates DOT regulations, which effectively "make it illegal to reinstate employees who test positive for drug use." *Foster Poultry Farms,* 74 F.3d at 174.

Second, DOT regulations militate against reinstating Wilson and Daniel without imposing any conditions upon their return to duty. The regulations provide:

Return to duty testing. A covered employee who refuses to take or *has a positive drug test* may not return to duty in the covered function until the covered employee has been evaluated face-to-face by a SAP, has properly followed any prescribed assistance, has passed a return-to-duty drug test administered under this part, and the SAP has determined that the employee may return to duty.

49 C.F.R. § 199.11(e) (emphasis added). This regulation provides extra assurance that a former employee who has used

drugs in the past will not perform a safety-sensitive function unless he or she is no longer using drugs. Here, the arbitrator did not order any return to duty testing.[8] The outright reinstatement of Daniel and Wilson violates this policy.[9]

The case law does not require a contrary conclusion. In *Eastern Associated Coal*, the Supreme Court summarized the district court's decision as follows: "The District Court, while recognizing a strong regulation-based public policy against drug use by workers who perform safety-sensitive functions held that [the employee's] *conditional reinstatement* did not violate that policy." 121 S.Ct. at 466 (emphasis added).[10] "The Court of Appeals for the Fourth Circuit affirmed on the reasoning of the District Court[,]" and the Supreme Court affirmed. *Id.* In doing so, the Supreme Court made clear that the conditions imposed on the employee's rein-

---

**8.** Notably, Ashby's letter, on which the arbitrator substantially relied to reach his conclusion, states that "if the employees are reinstated, they may resume safety-sensitive duties *without pursuing the return-to-duty process* specified by the RSPA for employees who violate the rules."

**9.** The district court recognized that "the 'outright' reinstatement of two employees who failed drug tests to safety-sensitive positions, without return to duty testing as provided under 49 C.F.R. § 199.11(e), would violate the public policy requiring such testing as a safeguard." However, based on the Union's assurances that " 'the grievants here understand and accept their (continued) (continued) obligation to submit to [return to duty] testing upon their return to duty[,]' " the district court decided that the arbitrator did not violate this policy by unconditionally reinstating the employees. Likewise, the majority emphasizes this condition, stating that "Daniel and Wilson returned to work at the Gas Company subject to their agreement to submit a drug test before returning to duty" and that "[t]he Appellants agreed to submit to DOT drug tests before returning to duty."

> [E]stablished law ordinarily precludes a court from resolving the merits of the parties' dispute on the basis of its own factual determinations, no matter how erroneous the arbitrator's decision. Even when the arbitrator's award may properly be vacated, the appropriate remedy is to remand the case for further arbitration proceedings.

*Major League Baseball Players Assoc. v. Garvey*, 532 U.S. 504, 121 S.Ct. 1724, 1730, 149 L.Ed.2d 740 (2001) (per curiam). The question presented is whether the arbitrator's award violates public policy, not whether we—or the district court—can adjust the remedy ordered by the arbitrator to comply with public policy. *Cf. Enter. Wheel*, 363 U.S. at 597, 80 S.Ct. 1358 ("When an arbitrator is commissioned to interpret and apply the [CBA], he is to bring his informed judgment to bear in order to reach a fair resolution of a problem. This is especially true when it comes to formulating remedies.") Here, the arbitrator placed no conditions on the reinstatement, and that is the award we must review. In addition, I find it ironic that Wilson and Daniel concede that they are subject to return to duty testing. On the one hand, they argue that they are not covered by 49 C.F.R. § 199.9(a)(1) because the drug test they failed did not strictly comply with DOT regulations. On the other hand, they admit that they are covered by 49 C.F.R. § 199.11(e), which only applies if they have failed a drug test administered under DOT regulations.

**10.** The arbitrator's first award reinstated the employee drug user "provided that [the employee] (1) accept a suspension of 30 days without pay, (2) participate in a substance-abuse program, and (3) undergo drug tests at the discretion of [the company] ... for the next five years." *E. Associated Coal*, 121 S.Ct. at 466. One year later, when the employee tested positive for drugs a second time, the arbitrator:

> ordered [the employee's] reinstatement provided that [he] (1) accept a new suspension without pay, this time for slightly more than three months; (2) reimburse [the company] and the union for the costs of both arbitration proceedings; (3) continue to participate in a substance abuse program; (4) continue to undergo random drug testing; and (5) provide [the company] with a signed, undated letter of resignation, to take effect if [he] again tested positive within the next five years. *Id.*

statement were significant to the question presented:

> [O]f course, the question to be answered is not whether [the employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so. To put the question more specifically, does a contractual agreement to reinstate [the employee] *with specified conditions* run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?

*Id.* at 467 (emphasis added). Similarly, in *Stead Motors,* this circuit framed the relevant inquiry as follows: "[D]oes the arbitrator's order reinstating (*following a disciplinary suspension*) an auto mechanic who committed a reckless act violate an 'explicit, well defined and dominant' public policy?" 886 F.2d at 1212 (emphasis added). Thus, neither of these cases speak to the question of an arbitral award that orders *unconditional* reinstatement of employees who have willfully violated federal safety regulations.

Finally, the dangerous nature of the gas pipeline industry militates against the reinstatement of employees who test positive for drug use. *See Iowa Elec. Light & Power v. Local Union 204 of the Int'l Bhd. of Elec. Workers,* 834 F.2d 1424, 1428 (8th Cir.1987) (examining the "public interest in the safe operation of nuclear power plants" in affirming on public policy grounds the district court's vacateur of the arbitrator's reinstatement). As the Eighth Circuit has noted, "[c]ourts have rejected awards that have ruled in favor of an operator of dangerous equipment who possesses drugs," whereas the "labor awards directing the reinstatement of employees whose acts posed no danger to public health or safety are usually upheld." *Id.* at 1428–29; *see also Stead Motors,* 886 F.2d at 1216 (dis-

tinguishing *Iowa Electric* in dicta because the "nuclear power industry is unique both with respect to the magnitude of the risk that results from negligent or reckless employee conduct and the comprehensiveness of the governmental regulation.")

Here, Wilson and Daniel's drug use undoubtedly poses a danger to public health and safety because the gas pipeline industry, like the nuclear power industry, is extremely hazardous. In the Notice of Proposed Rulemaking ("NPRM") issued by the DOT, the Research and Special Programs Administration ("RSPA") reviews the dangers of drug use in pipeline transportation:

> Personnel who use drugs *can pose dangers to themselves and co-workers and can cause or exacerbate events that may take human life, destroy property, and seriously harm the environment.* The Department of Transportation and the Research and Special Programs Administration (RSPA) are committed to the goal of a drug-free transportation system in all modes of transportation.... RSPA believes that the public expects, and is entitled to expect, that transportation systems will be operated safely. The Department's drug abuse prevention initiative in this area was formulated in response to a potential threat to the safe operation of pipelines transporting natural gas, and hazardous liquids, as well as the production and storage of LNG. The potential for accidents caused by pipeline personnel whose skills may be impaired due to drug usage will be greatly decreased by the implementation of a drug testing program.... Further, many routine construction, operations, and maintenance functions, as well as emergency response activities, demand skilled, competent, alert and unimpaired workers to perform the functions safely. When a pipeline failure occurs, regard-

less of its cause, critical decisions must be made quickly to abate the risk and return the pipeline to safe operation. The ability of personnel to rapidly respond to such a situation is crucial to the overall safety of pipeline operation.... The objective of drug testing is to ensure a drug-free transportation system environment which will enhance overall safety and assure public confidence.

53 Fed.Reg. 25892–01, 25893, 25895–96 (July 8, 1988) (emphasis added). In the commentary accompanying the DOT rules and regulations, the RSPA states:

[T]he large majority of commenters, even those opposing the rule, agree that a drug-impaired employee should not be performing a safety-related function on a pipeline. In fact, the majority of pipeline companies commenting on the rule stated that they had implemented anti-drug programs which generally included pre-employment, post-accident, and reasonable cause testing. The RSPA believes that the safety positions on a pipeline should not be performed by those impaired by drugs and that this rulemaking action to deter drug use is warranted and will promote safety.... *Although pipelines do not transport passengers, this is not a critical determinant in deciding whether an anti-drug abuse rule is needed.... Drug-using transportation employees can endanger not just passengers but other members of the public as well. Pipelines criss-cross the nation with transmission pipeline systems and there are extensive natural gas distribution systems located in the heart of most populated areas. Release of the hazardous commodities transported by these pipelines can endanger both pipeline employees and any member of the public who may happen to live, work, attend school near, or simply pass by the pipeline. Risk is even greater for people living near LNG storage facilities where the sudden release of a large volume of LNG can engulf surrounding areas with a flammable vapor cloud and create the potential for conflagration.... No amount of supervision or peer observation in the pipeline industry will assure that a drug abusing employee does not report for duty with drug use undetected and no built-in safety device is truly fail-safe.*

53 Fed.Reg. 47084–01, 47087 (Nov. 21, 1988) (emphasis added). "The fact that [Daniel and Wilson's violations of the anti-drug policy] did not result in any actual injury to public health or safety is of no consequence. [Their] willful actions could have caused a disaster.... 'They are no longer to be trusted to work in such a critical environment when [they show] no respect for the safety implications of [their] actions and when [they are] willing to jeopardize the safety of the public.'" *Iowa Elec.*, 834 F.2d at 1429.

### B.

Although other policies are embodied in the DOT regulations, none is sufficient to overcome the strong policy against reinstatement here. In rendering the award, the arbitrator examined "the reasons why a positive test result must be reviewed by a qualified physician before the Company takes action." Specifically, he noted that:

Random drug testing is, of course, a serious invasion of a person's privacy. Labs make mistakes, and people can be taking legal medications or possibly benign substances that can produce false positives. A positive test result typically results in severe discipline; indeed, here, a single positive test results in automatic discharge for employees with less than fifteen years of service. Review of a positive test by a qualified physician is intended to reduce the risk

of false positives. It is, therefore, an absolutely essential part of the regulatory process.

First, as the arbitrator noted, the regulations reflect a policy to protect the privacy of employees from the stigma of being labeled a drug user before the test results are verified. Section 40.33(a)(1) requires MRO review of all positive test results *prior* to transmission of the results to the Company. Mr. Ashby, the Deputy Assistant General Counsel of DOT, noted that "[i]f, as in this case, the employer learns of a positive result prior to such a review, then harm has occurred—the employee is labeled as a drug user and personnel consequences ensure—without an 'essential' prerequisite." The DOT has made clear however, that the privacy interests of the employees are not of paramount concern:

> [T]he clear public interest in assuring that certain sensitive safety-related pipeline personnel perform their duties free of prohibited substances provides justification for testing and its limited intrusion on privacy expectations of covered employees. The drug problem in society in general and probability of drug use in the pipeline industry were discussed in the preamble of the NPRM. The impairing effects of drugs and the substantial risks to public safety posed by sensitive safety-related pipeline personnel who use drugs underlies the compelling governmental interest in the promulgation of this rule.

53 Fed.Reg. 47084–01, 47085 (Nov. 21, 1988).

Moreover, the significance of privacy in hazardous industries was conclusively determined by the Supreme Court in *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). In *Skinner* the Court evaluated whether alcohol and drug testing of railroad employees who violate safety rules conforms with the Fourth Amendment protection against unreasonable searches and seizures. At stake in *Skinner* was as strong a policy in favor of individual privacy as one could expect to find. "The Amendment *guarantees* the privacy, dignity, and security of persons against certain arbitrary and invasive acts by officers of the Government or those acting at their direction." *Id.* at 613–14, 109 S.Ct. 1402 (emphasis added); *see also id.* at 621–22, 109 S.Ct. 1402 ("An *essential* purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents." (emphasis added)).

The Court first determined that drug and alcohol testing entailed numerous intrusions into the employees' privacy—from "[t]he initial detention necessary to procure the evidence," *id.* at 616, 109 S.Ct. 1402, to "the collection and testing of urine," *id.* at 617, 109 S.Ct. 1402. The Court next considered the "Government's interest in regulating the conduct of railroad employees to ensure safety," *id.* at 620, 109 S.Ct. 1402, noting that the employees covered by the regulation at issue were "engaged in safety-sensitive tasks." After weighing these competing interests, the Court concluded that "the expectations of privacy of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Id.* at 627, 109 S.Ct. 1402. By contrast, the Court determined that "the Government interest in testing without a showing of individualized suspicion is compelling[,]" *id.* at 628, 109 S.Ct. 1402, because:

> Employees subject to the tests discharge duties fraught with such risks of injury to others that even a momentary

lapse of attention can have disastrous consequences. Much like persons who have routine access to dangerous nuclear power facilities, employees who are subject to testing under the FRA regulations can cause great human loss before any signs of impairment become noticeable to supervisors or others.

*Id.* (citations omitted). Thus, the Court held, "the Government's compelling interests outweigh [the employees'] privacy concerns." *Id.* at 633, 109 S.Ct. 1402. In conclusion, the Court summarized:

> The possession of unlawful drugs is a criminal offense that the Government may punish, but it is a separate and far more dangerous wrong to perform certain sensitive tasks while under the influence of those substances. Performing those tasks while impaired by alcohol is, of course, equally dangerous, though consumption of alcohol is legal in most other contexts. The Government may take all necessary and reasonable regulatory steps to prevent or deter that hazardous conduct, and since the gravamen of the evil is performing certain functions while concealing the substance in the body, it may be necessary, as in the case before us, to examine the body or its fluids to accomplish the regulatory purpose. *The necessity to perform that regulatory function with respect to railroad employees engaged in safety-sensitive tasks, and the reasonableness of the system for doing so, have been established in this case.*

*Id.* at 633, 109 S.Ct. 1402 (emphasis added).

*Skinner* instructs that in the context of a heavily regulated industry such as the gas industry, safety-sensitive employees have a diminished privacy interest when it comes to drug testing. If the strong privacy guarantees of the Fourth Amendment are overcome by the governmental necessity to regulate safety-sensitive tasks, then certainly the lesser privacy interests protected by the MRO requirement in this case do not outweigh the dominant policy against drugs in the workplace. *See also Carroll v. Fed. Express Corp.*, 113 F.3d 163, 166 (9th Cir.1997) ("The regulations requiring motor carriers to maintain a drug-free workforce may produce the collateral benefit of increasing safeguards for the privacy of tested individuals, but their raison d'etre is the protection of the general public.").

The second policy consideration the arbitrator recognized is protecting employees from being terminated for false positive test results. This is accomplished through the MRO review requirement. *See, e.g.,* 49 C.F.R. § 199.3 (defining "[f]ail a drug test" as "the confirmation test result shows positive evidence of the presence *under DOT procedures* of a prohibited drug in an employee's system." (emphasis added)); 49 C.F.R. § 40.33(a)(1) ("An essential part of the drug testing program is the final review of confirmed positive results from the laboratory.... An individual with detailed knowledge of possible alternate medical explanations is essential to the review of results.") Undeniably, it is important to ensure that employees are not erroneously terminated as a result of faulty drug tests. This policy is of negligible significance in this case, however, because it is undisputed that the laboratory followed proper procedures in collecting and analyzing Daniel and Wilson's drug tests. Further, the results of those tests were verified by a licensed physician acting as an MRO. It is beyond dispute that Daniel and Wilson used illegal drugs.

The only procedural error in this case was the premature reporting of Daniel and Wilson's positive test results to the Company. Thus, the Company substantially

complied with the procedures. Daniel and Wilson have not demonstrated any harm or prejudice from this error and they cannot do so because their drug test results were confirmed to be positive. *Cf. Frank v. Dep't of Transp. Fed. Aviation Admin.*, 35 F.3d 1554 (Fed.Cir.1994) (declining to adopt view that non-compliance with drug testing procedures is per se harmful and prejudicial error sufficient to invalidate a drug test). Therefore, the concern of mistaken termination is simply not implicated in this case.

The majority implicitly acknowledges this fact when it comments that "adopting a substantial compliance standard *would* create a slippery-slope which could *eventually* have the effect of undermining the interests the procedural requirements are designed to protect." (Emphasis added). The majority is concerned that in future cases, "[i]f a 'substantial compliance' standard were adopted, there would be no way to draw the line as to the circumstances under which it could be said that an employee has 'failed a drug test' under the DOT regulations."

Under the facts of this case, however, a line *can* be drawn. As the majority recognizes, the procedural requirement of having an MRO review positive test results is designed to ensure the accuracy of the drug tests so as to prevent mistaken terminations. Although the majority takes issue with my use of the phrase "confirmed drug users," there is simply no doubt that Wilson and Daniel used drugs and that their drug use was confirmed by a licensed MRO. The procedural requirement designed to ensure the veracity of the test results was satisfied in this case and so, contrary to the majority's conclusion, it can be said that Wilson and Daniel each "failed a drug test."

On the other hand, the timing of the MRO review *before* termination is de-signed to ensure the privacy of employees. Noncompliance with this requirement was the only procedural defect in this case. The diminished privacy interests of employees in safety sensitive positions do not warrant the majority's exaltation of procedure over substance. Although the majority purports to "take very seriously" my concern over employing confirmed drug users in safety sensitive positions, it states that the question "whether the arbitrator had 'little doubt' about the employees' purported drug use is neither here nor there." I cannot accept that conclusion. The undeniable purpose of random drug testing in hazardous industries is to protect public safety. Where public safety is in jeopardy, it is that concern, not the privacy of individual workers, that is paramount.

### CONCLUSION

In explaining his order, the arbitrator stated: "I am frank to admit [ ] that sustaining these grievances is troubling. I have little doubt that both grievants had the illegal substances in question in their bodies, based on the evidence presented, and I am not particularly happy about ordering them reinstated and made whole." It is clear, then, that in ordering reinstatement the arbitrator understood that Wilson and Daniel were drug users. While the arbitrator did not explain the reason that he was troubled and unhappy in ordering reinstatement, it was undoubtedly based on his awareness that he was exposing the public to the risk of harm from drug using employees in a safety-sensitive industry.

I respectfully dissent because the majority's opinion upholds an arbitrator's order that does not draw its essence from the unambiguous requirement of the CBA that employees such as Wilson and Daniel must be terminated if they test positive for drug use. The arbitrator's order is also con-

trary to the firmly established public policy that persons engaged in safety-sensitive positions must be terminated to protect others from the harm they may cause by using drugs.