**SSA TERMINALS, Petitioner,**

v.

**MACHINISTS AUTOMOTIVE TRADES DISTRICT LODGE NO. 190—Automotive Machinists Lodge No. 1414 of the International Association of Machinists and Aerospace of Workers, Respondent.**

**No. C–02–5265–SC.**

United States District Court, N.D. California.

Feb. 12, 2003.

---

Cynthia L. D'Ambrosio, James J. McMullen, Jr., Gordon & Rees, San Diego, CA, for Petitioner.

## ORDER DENYING PETITIONER'S MOTION TO VACATE ARBITRATION AWARD

CONTI, District Judge.

### I. INTRODUCTION

On October 31, 2002, Petitioner SSA Terminals (SSAT) filed, pursuant to 9 U.S.C. § 10(a)(4), a motion to vacate the arbitration Decision and Award of August 2, 2002 (Award), that directs Petitioner to reinstate James Huey to his former position as a refrigeration mechanic and to pay him full back pay and benefits. For the reasons set forth below, this Court denies Petitioner's motion, and directs Petitioner immediately to comply with the Award.

### II. BACKGROUND

James Huey has worked for Petitioner and its predecessor at the same location for approximately 23 years, most recently as a refrigeration mechanic. His employment is governed by a Collective Bargaining Agreement (CBA). On September 1, 2000, Huey reported an on-the-job accident that injured his lower back. Huey received treatment for his injury from two board-certified physicians: Dr. Julie Nefkens, an internist, and Dr. Jeffrey Meter, an orthopedic surgeon. Based on her opinion and that of Dr. Meter, Dr. Nefkens completed several work restriction slips that Huey submitted to Petitioner. These slips indicated that Huey should not bend, lift, or climb at all. Following his doctors' orders, Huey did not return to work.

Petitioner was suspicious of Huey's claimed disability, and communicated this suspicion to its workers' compensation insurance carrier, who then investigated Huey's claim. The insurance carrier arranged to videotape Huey surreptitiously during the time that he was, according to his doctors, unable to return to work. Petitioner contends that the videotapes show Huey engaging in numerous physical activities that involve bending, lifting, and climbing. According to Petitioner, these activities include using a hedge trimmer, a leaf blower strapped to his back, and a lawn mower, as well as jumping up and down to compact the debris in a trash container, and lifting a garbage container over his head.

In December, 2000, the insurance carrier deposed Huey. At no time before or during the deposition did Petitioner or the insurance carrier provide Huey an opportunity to view the videotape, nor did they notify Huey that the videotape existed. Petitioner contends that Huey perjured himself at the deposition by falsely stating that he complied with all the physical restrictions imposed by his doctors.

On January 8, 2001, Petitioner terminated Huey's employment. The letter of termination explains that Petitioner terminated Huey essentially because Huey allegedly "intentionally misrepresented [his] physical limitations and subjective complaints to [his] doctors and to the employer/compensation carrier for the purpose of obtaining Workers' Compensation benefits." (Pet'r's Ex. J).

Huey filed a grievance challenging his termination, and the dispute went to arbitration. Gerald R. McKay (Arbitrator) conducted the arbitration, and held hearings on May 13, May 21, and May 22, 2002. On August 2, 2002, the Arbitrator issued the Award which concluded that Petitioner did not have just cause to terminate Huey and directed Petitioner to reinstate Huey with full back pay and benefits.

Now pending before this Court is Petitioner's motion to vacate the Arbitrator's Award on the ground that the Award exceeds the Arbitrator's power under 9 U.S.C. § 10(a)(4). Huey, on the other hand, asks this Court to deny Petitioner's motion, to confirm the Arbitrator's award, and to order Petitioner to pay Huey's attorneys' fees in this proceeding.

## III. *LEGAL STANDARD*

In general, courts reviewing the decision of a labor arbitrator are required to accord an arbitrator's decision a "nearly unparalleled degree of deference," *Stead Motors of Walnut Creek, v. Automotive Machinists Lodge Number 1173, International Association of Machinists and Aerospace Workers*, 886 F.2d 1200, 1205 (9th Cir. 1989) (citations omitted). "When reviewing the award of arbitrator chosen by the parties to a collective bargaining agreement, we are bound—under all except the most limited circumstances—to defer to the decision of another even if we believe that the decision finds the facts and states the law erroneously." *Id.*, 886 F.2d at 1204.

The reason for this unusually high degree of deference is that the arbitrator's decision is deemed to be part of the parties' agreement.

> Unlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the collective bargaining agreement is a skeletal, interstitial document. The labor arbitrator is the person the parties designate to fill in the gaps; for the vast array of circumstances they have not considered or reduced to writing, the arbitrator will state the parties' bargain. He is "the parties' officially designated 'reader' of the contract... their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary" to handle matters omitted from the agreement...
> Since the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot "misinterpret" a collective bargaining agreement. As Professor St. Antoine observes, "[i]n the absence of fraud or an overreaching of authority on the part of the arbitrator, he is speaking for the parties, and his award *is* their contract." Thus, what courts do when they review an arbitrator's award is more akin to the review of a contract than of the decision of an inferior tribunal: the award, just as a contract, is the expression of the parties' will and must be enforced as expressed unless illegal or otherwise void.

*Stead Motors*, 886 F.2d at 1205–06 (citations omitted). Furthermore, and consistent with the arbitrator's role as filler of the gaps in a CBA, it is well established that an arbitrator can look beyond the four corners of the CBA when interpreting the CBA.

> As to the bases for an arbitrator's award, commentators and courts have long recognized that the arbitrator is entitled, and is even expected, to range afield of the actual text of the collective bargaining agreement he interprets: "The labor arbitrator's source of law is not confined to the expressed provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally part of the collective bargaining agreement although not expressed in it."

*Stead Motors*, 886 F.2d at 1206–07, citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Company*, 363 U.S. 574, 581–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). In fact, courts are not competent to second-guess an arbitrator's judgment because courts are unfamiliar with "the practices of the industry and the shop." *Stead Motors*, 886 F.2d at 1207.

There are, of course, exceptions to the general rule that courts must defer to the judgment of an arbitrator. However, these exceptions are extremely narrow.

> While we accord an arbitrator's decision a "nearly unparalleled degree of deference," *Stead Motors*, 886 F.2d at 1205, we have identified narrow exceptions to the general rule. Vacatur of an arbitration award under section 301 of the LMRA [Labor Management Relations Act] is warranted: (1) when the award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing his own brand of industrial justice; (2) where the arbitrator exceeds the boundaries of the issues submitted to him; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud.

*Southern California Gas Company v. Utility Workers Union of America*, 265 F.3d 787, 792–93 (9th Cir.2001). Two of these exceptions are relevant in this case: the essence of the contract exception, and the public policy exception. The Ninth Circuit has clearly stated that both exceptions are extremely narrow:

> We believe that courts must apply the "his own brand" or "draw its essence" exceptions to judicial deference in the same way in which we have held that they must apply the "public policy" exception. In both circumstances, "judicial scrutiny of an arbitrator's decision is extremely limited."

*Stead Motors*, 886 F.2d at 1208, note 8, citing *Sheet Metal Workers v. Arizona Mechanical & Stainless, Inc.*, 863 F.2d at 653 (9th Cir.1988).

### A. Essence of the Contract Exception

The Supreme Court has sharply limited the application of the essence of the contract exception:

> As the Court has said, the arbitrator's award settling a dispute with respect to the interpretation or application of a labor agreement must draw its essence from the contract and cannot simply reflect the arbitrator's own notions of industrial justice. But as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

*United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 39, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). The Ninth Circuit has set forth a slightly different formulation of the same rule:

> The arbitrator's factual determinations and legal conclusions generally receive

deferential review as long as they derive their essence from the [collective bargaining agreement]. If, on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced. This remains so even if the basis for the arbitrator's decision is ambiguous and notwithstanding the erroneousness of any factual findings or legal conclusions. *Stead Motors,* 886 F.2d at 1209, citing *Sheet Metal Workers,* 863 F.2d at 653.

### B. Public Policy Exception

To vacate an arbitration award on public policy grounds, a court must find: (1) that an "explicit, well-defined and dominant" public policy exists, and (2) "that the policy is one that specifically militates against the relief ordered by the arbitrator." *Stead Motors,* 886 F.2d at 1212–1213. Such a public policy must be "ascertained by reference to the laws and legal precedence and not from general considerations of supposed public interests." *Misco,* 484 U.S. at 43, 108 S.Ct. 364 (internal citations omitted). In addition,

> If a court relies on public policy to vacate an arbitral award reinstating an employee, it must be a policy that bars *reinstatement.* Courts cannot determine merely that there is a "public policy" against a particular sort of behavior in society generally and, irrespective of the findings of the arbitrator, conclude that reinstatement of an individual who engaged in that sort of conduct in the past would violate that policy.

*Stead Motors,* 886 F.2d at 1212.

## IV. DISCUSSION

Petitioner makes five arguments in support of its motion to vacate the Award. As is discussed below, none of these arguments is convincing.

### A. Petitioner's First Argument

■ First, Petitioner argues that this Court should vacate the Award because the Award sanctions violations of sections 1871.4(a)(1) and 1871.4(a)(2) of the California Insurance Code. Section 1871.4(a)(1) makes it unlawful to "make or cause to be made any knowingly false or fraudulent material statement or material representation for the purpose of obtaining or denying any compensation..." Section 1871.4(a)(2) makes it unlawful to "present or cause to be presented any knowingly false or fraudulent written or oral material statement in support of, or in opposition to, any claim for compensation for the purpose of obtaining or denying any compensation..."

Citing the video that captures Huey repeatedly engaging in rigorous activities that require him to bend, lift, climb, kneel and squat, Petitioner contends that Huey violated the above-cited provisions when he submitted to Petitioner work restriction slips (these slips were completed by Huey's treating physicians) indicating that he was unable to bend, lift and climb.

This argument fails for two reasons. First, it flatly contradicts the Arbitrator's factual findings. The Arbitrator found both that Huey did not lie to his doctors (Pet'r's Ex. A, at 28), and that neither of Huey's treating physicians "acted improperly or in any other way that would be considered fraudulent." *Id.,* at 33. These factual findings, to which this Court is bound to defer,[1] preclude the conclusion that Huey's submission of work restriction slips violated either of the two provisions of the California Insurance Code cited above.

---

1. As is more fully discussed below, neither the essence of the contract exception nor the public policy exception allows this Court to disregard the explicit findings of the Arbitrator in this case.

Second, Petitioner has cited no authority for the proposition that a court may vacate an arbitration award because that award might "sanction" violations of law. Certainly, a court cannot uphold an arbitration award that requires the performance of an illegal act. *American Postal Workers Union v. United States Postal Service*, 682 F.2d 1280, 1286 (9th Cir.1982). But Petitioner has failed to show that compliance with the arbitration award in this case would require *anyone* to violate *any* law. In other words, Petitioner has failed to show that the arbitration award constitutes an illegal contract. In addition, the fact that the arbitration award might "sanction" violations of law does not provide sufficient basis for this court to vacate the award under the public policy exception to the general rule that courts must uphold arbitral awards. This is because Petitioner has presented no evidence of any explicit, well-defined and dominant public policy that bars reinstatement of an employee who commits insurance fraud.

### B. Petitioner's Second Argument

■ Petitioner cites California Civil Code section 56.10(a), and argues that the provision prohibits Petitioner from obtaining Huey's medical information from his doctors without first obtaining authorization [from Huey]. Thus, as Petitioner argues, "to enforce the award would require Petitioner to violate the law in order to bring its employee relations policy and procedures into compliance with the arbitrator's findings and conclusions, which require Petitioner to obtain medical information directly from its employees' doctors." Memo, at 9.

This argument fails for several reasons. First, the award requires Petitioner to reinstate Huey. It does not require Petitioner to obtain *anyone's* medical records. It simply does not require Petitioner to violate section 56.10(a) of the California Civil Code.

Second, to the extent that Petitioner's argument is that upholding the arbitration award in this case would set a precedent which would require an employer to violate medical privacy laws in the future, it is unconvincing. Petitioner itself concedes that an employer in California may legally obtain medical records of an employee if the employer first receives authorization from the employee. Therefore, an employer can easily avoid violating medical privacy laws by instituting, as a condition for employment, a requirement that employees who file workers' compensation claims authorize the employer to obtain the relevant medical records. In fact, it would be quite surprising if Petitioner's employees are not already bound by such a rule.

Third, Petitioner's argument suggests that it did not obtain Huey's medical records from the doctors who treated him for his lower back injury because doing so would have been illegal. However, the termination letter that Petitioner sent to Huey cites Huey's medical records as evidence of the Petitioner's grounds for terminating Huey. If Petitioner did not in fact obtain these records, then one should be much more skeptical of the allegations contained in its termination letter. If Petitioner did obtain these records, the logic of Petitioner's argument suggests that Petitioner has already violated California's medical privacy laws. Of course, if Petitioner were to deny that it has violated these laws, that denial would completely refute Petitioner's argument that the arbitration award did or would require Petitioner or a similarly situated employer to violate these medical privacy laws.

Fourth, Petitioner has cited no public policy that would bar *reinstatement* of Huey.

## C. Petitioner's Third Argument

■ Petitioner argues that it would have been illegal for the workers' compensation insurance carrier to have contacted Huey's doctors to confirm his medical condition and then to provide that medical information to Petitioner. California Labor Code section 3762(c), according to Petitioner, "prohibits [Petitioner's] insurance carrier from providing medical information to [Petitioner] about an employee's workers compensation claim unless the information is necessary to modify work duties." (Pet'r's Mem. in Support of its Mot. to Vacate Arbitration Award, at 9). Petitioner then argues that the Award orders an illegal act because the Award's effect is "to require Petitioner to attempt to unlawfully obtain private medical information before it can terminate someone for just cause for dishonesty." (Pet'r's Mem. in Support of its Mot. to Vacate Arbitration Award, at 9).

This argument fails for reasons very similar to those that refute Petitioner's second argument above. First, it is, for two reasons, disingenuous for Petitioner to argue that it would have been illegal for the workers' compensation insurance carrier to have obtained medical information about Huey from Huey's doctors and then provided that information to Petitioner. The first reason is that, as discussed above, Petitioner cited Huey's medical records in its termination letter, thereby strongly implying, if not simply conceding, that Petitioner had access to Huey's medical records on or before January 8, 2001. The second reason is that, as Petitioner itself concedes, a transfer of Huey's medical information from the insurer to Petitioner would most likely have been legal, since "the information [would have been] necessary to modify work duties." [2]

Second, Petitioner incorrectly argues that the Award orders an illegal act. Petitioner has failed to show that reinstating Huey or paying him back-pay violates any law. Furthermore, as discussed above, the Award does not require Petitioner to obtain any information unlawfully.

## D. Petitioner's Fourth Argument

■ Citing California Insurance Code § 1871(d), Petitioner argues that the "award violates specific California public policy designed to prevent workers' compensation fraud by forcing Petitioner to reinstate an employee who misrepresented his ability to perform physical activities to procure workers' compensation." (Pet'r's Mem. in Support of its Mot. to Vacate Arbitration Award, at 10). Thus, Petitioner continues,

> this Court, like the court in *American Postal Workers Union v. U.S. Postal Service*, 682 F.2d 1280 (9th Cir.1982), "cannot empower the arbitrator to nullify the mandates of" the California Legislature by concluding that Mr. Huey did not misrepresent his ability to work, when the undisputed facts demonstrate that he deceived Petitioner to ensure continuation of his paid leave under workers' compensation.

(Pet'r's Mem. in Support of its Mot. to Vacate Arbitration Award, at 11).

**2.** Petitioner argues in its moving papers that "there was no reason or occasion to discuss [Huey's] medical condition in the context of modified work duties or otherwise" because Huey represented to Petitioner that all bending, lifting and climbing was prohibited. Not only does this argument contradict the position Petitioner took at the arbitration proceedings (in arbitration, Petitioner argued that it would have modified Huey's work duties had it been aware that Huey was able to perform a light duty job), but it is also nakedly disingenuous. After all, if Petitioner were truly suspicious of Huey, Petitioner had every reason to discuss Huey's medical condition in the context of modified work duties.

This argument fails for two reasons. First, Petitioner misrepresents the facts of this case. There was indeed a dispute about whether Huey deceived Petitioner to receive workers' compensation benefits, and the Arbitrator has settled the dispute in favor of Huey. The Arbitrator clearly found that Huey did not lie to his doctors, and that Huey did nothing wrong in submitting to Petitioner the work restriction slips completed by his doctors. Furthermore, while the Arbitrator did not explicitly find that Huey did not lie during the deposition, the Arbitrator concluded that "the deposition in the manner in which it was conducted was entirely improper as part of an investigation under the concept of just cause for an employee termination." (Pet'r's Ex. A, at 31). These and other findings led the Arbitrator ultimately to conclude that Petitioner had not met its burden of establishing, by clear and convincing evidence, that it had just cause to terminate Huey. This Court is, of course, obligated to defer to the Arbitrator's decision, unless Petitioner can show that one of the narrow exceptions to this deference applies.

This brings us to the second reason why Petitioner's argument fails. This Court cannot vacate the Award because Petitioner has failed to cite any public policy that bars *reinstatement* of Huey.

As we have explained, the critical inquiry is not whether the underlying act for which the employee was disciplined violates public policy, but whether there is a public policy barring *reinstatement* of an individual who has committed a wrongful act. *Grace*, 461 U.S. at 766, 103 S.Ct. 2177; *Misco*, 108 S.Ct. at 373. Besides being inconsistent with the Supreme Court's determination that it is enforcement of the award which must be deemed violative of public policy, we think the Eleventh Circuit's approach would produce, at best, curious results. If the performance of an illegal act while on the job is all that must be proved to demonstrate the violation of a public policy for purposes of *Grace* and *Misco,* then an arbitrator would be *prohibited* from reinstating any teamsters who receive a speeding ticket while driving the company truck, or even an inventory clerk who commits a single act of petty theft. *Grace* and *Misco* do not countenance such results.

*Stead Motors,* 886 F.2d at 1215.

### E.  Petitioner's Fifth Argument

Petitioner argues that the Award ignores the parties' contractual agreement by punishing Petitioner for unrelated conduct by a third party. Petitioner's reasoning is as follows: (1) the scope of the arbitration was limited to the issue of just cause under the contract, and that, accordingly, "the scope of the arbitrator's role was to determine whether Mr. Huey was dishonest to Petitioner," (Pet'r's Mem. in Support of its Mot. to Vacate Arbitration Award, at 11); and (2) "The uncontroverted evidence of Mr. Huey's evasiveness and deception and the award itself establish that the arbitrator deviated from his duty, ignored the contract and decided this matter on emotion, passion, prejudice and whim to further his cause against the insurance and workers' compensation communities." (Pet'r's Mem. in Support of its Mot. to Vacate Arbitration Award, at 11).

This argument is an attempt to invoke the essence of the contract exception to the deference owed to arbitral decisions. It fails. Petitioner is correct to note that the scope of the Arbitrator's role was to determine whether Petitioner proved that it had just cause to terminate Huey. This is precisely what the Arbitrator did. He interpreted the "just cause" provision of the CBA: (1) to require Petitioner to establish just cause by clear and convincing evidence, (2) to implicate notions of due process which, among other things, require

an employer to conduct a full and fair investigation before terminating an employee, and (3) to impose on Petitioner the "responsibility to explain to doctors who are examining [its] employees, in situations where the [Petitioner] provides light duty, the nature of the work available." (Pet'r's Ex. A, at 30). This Court has no doubt that the Arbitrator's interpretation of the "just cause" provision is, on its face, plausible.

Furthermore, the Arbitrator's factual findings and ultimate conclusion represent a plausible interpretation of the CBA.[3] The Arbitrator's award is a 35–page document that sets forth the facts of the case in great detail, and extensively cites testimony from the arbitration hearings. The Arbitrator summarized the case as follows:

> In summary, the [Petitioner] relied on Ms. Bustos' [the claims manager for Petitioner's workers' compensation carrier] conclusion that [Huey] engaged in fraud and misrepresentation to his doctors about his physical condition, and based on that misrepresentation, should be terminated. Ms. Bustos reached these conclusions because, in her opinion, [Huey] was suffering from no medical disability at all. [Huey's] treating physicians observed the surreptitious videotapes and concluded that [Huey] had not lied to them; that he did suffer from a physical disability; that he was not capable of performing all of his duties; but that he could have performed light duty had the physicians been aware of it. The [Petitioner] failed to establish that it had a policy on light duty and failed to establish that it has a policy at the present time on light duty. The [Petitioner]

failed to establish that it had communicated with [Huey's] physicians to inform them that it had light duty and explain to them the nature of the work that employees would be expected to perform on light duty. The treating physicians assumed, as [Huey] did, that no light duty was available and placed the restrictions based on that assumption even though both physicians were aware that [Huey] could have done more work than the restrictions indicated. The [Petitioner] had any number of opportunities to investigate more carefully [Huey's] physical condition by speaking to [Huey's] treating physicians or having [Huey] examined by the [Petitioner's] doctor. The [Petitioner] chose to do none of this because it relied entirely on Ms. Bustos' improper medical conclusions. As a result, when the [Petitioner] terminated [Huey], it did not have just cause to do so.

(Pet'r's Ex. A, at 33–34). In short, this Court finds that the Award draws its essence from and represents a plausible interpretation of the CBA. As a result, this Court is compelled to enforce the Award. *Stead Motors*, 886 F.2d at 1209.

### F. Attorneys' Fees

■ "Under the American rule, absent contractual or statutory authorization, a prevailing litigant ordinarily may not collect attorneys' fees. However, a court may assess attorneys' fees when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *International Union of Petroleum and Industrial Workers v. Western Industrial*

---

3. Petitioner also argues that the award reinstating Mr. Huey ignores the plain language of the contract which authorizes Petitioner to terminate an employee for just cause for dishonesty. Simply to make this argument is to reveal its absurdity. The fact that the Arbitrator decided to reinstate Huey pursuant to the

CBA does not mean that the Arbitrator ignored the portion of the CBA that authorizes termination for dishonesty. In fact, just the opposite is true. The Arbitrator's decision is based upon his interpretation of the just cause provision of the CBA.

*Maintenance,* 707 F.2d 425, 428 (9th Cir. 1983) (internal citations omitted).

> We ... conclude that an unjustified refusal to abide by an arbitrator's award may equate an act taken in bad faith, vexatiously or for oppressive reasons ... Moreover, bad faith may be demonstrated by showing that a defendant's obstinacy in granting a plaintiff his clear legal rights necessitated resort to legal action with all the expense and delay entailed in litigation.

*International Union of Petroleum and Industrial Workers v. Western Industrial Maintenance,* 707 F.2d 425, 428 (9th Cir. 1983) (The Ninth Circuit upheld the District Court's order directing the employer to pay the employee's attorneys fees when the company's refusal to abide by the arbitration award was without justification. The court clearly rejected the company's argument that it was justified in ignoring the Award because it believed—erroneously, it turns out—that the arbitration award was invalid).

This Court finds that Petitioner's refusal to abide by the Award, as well as Petitioner's motion to vacate the Award, are unjustified. Despite Petitioner's characterization of its challenge to the Arbitrator's award, this Court finds Petitioner's challenge to be nothing more than a disagreement with the Arbitrator's findings on the merits of the case. Because of the deference courts owe to arbitral decisions, a challenge to an arbitral decision based only on the merits of the case is frivolous because it is destined to fail. Furthermore, the Arbitrator's 35–page Award more than adequately addresses all the arguments Petitioner has raised its motion. A careful reading of the Award should have convinced Petitioner of the futility of moving this court to vacate the Award. For these reasons, Huey is entitled to reimbursement from Petitioner for his expenses related to this proceeding.

## V. *CONCLUSION*

For the reasons set forth above, this Court: (1) DENIES Petitioner's motion to vacate the Award, (2) ORDERS Petitioner immediately to comply with the Award by reinstating Huey to his former position as a refrigeration mechanic and by paying him back-pay and benefits as specified in the Award, and (3) ORDERS Petitioner to pay Huey's attorneys' fees and costs related to this proceeding. To facilitate compliance with reimbursement of attorneys' fees, this Court DIRECTS Huey to submit to Petitioner and to this Court, within fifteen days of the date of this Order, a statement of the reasonable attorneys' fees and costs incurred in opposing this motion.

IT IS SO ORDERED.